# EXHIBIT P

# LOAN AGREEMENT

THIS LOAN AGREEMENT (together with the exhibits attached hereto, this "Agreement") is made as of November 25, 2003 between **NATIONAL CITY BANK OF MICHIGAN/ILLINOIS** ("**Lender**") and **SHARON SKLAROV** ("**Borrower**"). All terms as used in this Agreement shall, unless otherwise defined in the recitals or the main body of this Agreement, have the meanings given to such terms in **Exhibit A** attached hereto.

## RECITALS

A.      Borrower shall be the owner of an office building consisting of approximately 282,965 square feet of net rentable area located at 500 North Broadway, St. Louis, Missouri ("**Property**"), which premises is more particularly described in **Exhibit B** attached hereto.

B.      At the request of Borrower, subject to the terms and conditions hereof, Lender has agreed to make (i) a term loan to Borrower in an amount equal to NINE MILLION SIX HUNDRED THOUSAND DOLLARS ($9,600,000.00), to finance the acquisition of the Property ("**Term Loan**") and (ii) a non-revolving line of credit loan to Borrower in an amount equal to FOUR MILLION TWO HUNDRED SIXTY-SIX THOUSAND DOLLARS ($4,266,000.00) to finance the completion of the Improvements and pay leasing commissions ("**Line of Credit Loan**") (Term Loan and Line of Credit Loan are collectively "**Loans**").

NOW, THEREFORE, in consideration of the covenants and agreements contained herein and in the other Loan Documents and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lender and Borrower hereby covenants and agrees as follows:

## ARTICLE 1

## LOAN PROVISIONS

Section 1.1      <u>Term Loan</u>.  Subject to the terms and conditions set forth herein, Lender has agreed to make the Term Loan to Borrower in the amount of NINE MILLION SIX HUNDRED THOUSAND DOLLARS ($9,600,000.00).

Section 1.2      <u>Line of Credit Loan</u>.  Subject to the terms and conditions set forth herein, Lender shall advance to Borrower proceeds of the Line of Credit Loan, at such times as the Borrower may from time to time request until, but not including, the Maturity Date, and in such amounts as the Borrower may from time to time request.

Section 1.3      <u>Term of Loans</u>. On the Maturity Date, the entire Debt, if not sooner paid or payable, shall become due and payable in full.

Section 1.4    Disbursement and Prepayment.

(a)    Term Loan Funding. Subject to the terms and conditions set forth in this Agreement, the Term Loan shall be funded on the Closing Date.

(b)    Line of Credit Loan Funding.  Subject to the terms and conditions set forth in this Agreement, the Line of Credit Loan shall be funded in accordance with **Article V**.

(c)    Prepayment. The indebtedness evidenced by the Notes may be prepaid in whole or in part, at any time as set forth in the Notes.

Section 1.5    Interest Rates.

(a)    Provided the conditions contained in **Section 1.6** are satisfied, interest on the Term Loan shall accrue at a rate equal to the One Month LIBOR Rate plus two hundred seventy-five basis points (2.75%).

(b)    Provided the conditions contained in **Section 1.6** are satisfied, interest on the Line of Credit Loan shall accrue at a rate equal to the One Month LIBOR Rate plus three hundred basis points (3.00%).

(c)    Notwithstanding anything to the contrary or inconsistent herein, in the event all of the conditions contained in **Section 1.6** herein are not satisfied, interest on the Loans shall accrue at the Prime Variable Rate plus one-half percent (0.50%).

(d)    From and after such time as an Event of Default occurs under this Agreement or any of the Loan Documents, or if the Loans are not paid in full on or prior to the Maturity Date, the unpaid balance outstanding under the Loans shall bear interest at an interest rate equal to the applicable interest rate, plus five percent (5%) (the **"Default Rate"**).

Section 1.6    Conditions for Basing Interest on the One Month LIBOR Rate.  Interest on the Loans will be based on the One Month LIBOR Rate upon the condition that:

(a)    There shall have occurred no change in applicable law which would make it unlawful, in Lender's sole discretion, for Lender to fund, make or maintain loans bearing interest based on the One Month LIBOR Rate; or

(b)    Circumstances affecting the market selected by Lender for the purpose of funding the Loans make it impracticable, in Lender's sole discretion, for Lender to determine the One Month LIBOR Rate.

Lender's books and records shall be conclusive (absent manifest error) as to whether Lender shall have determined that the interest rate is prohibited from being based on the One Month LIBOR Rate.  Lender shall serve Borrower notice of any such determination.

Section 1.7    Computation of Interest.    Interest accruing on the unpaid principal balance of the Loans shall be computed for the actual number of days elapsed on the basis of a year consisting of three hundred sixty (360) days.

Section 1.8    Principal and Interest Payments - Term Loan.    Borrower shall make monthly payments to Lender on the Term Loan as follows:

Commencing on December 26, 2003 and continuing on the same day of each succeeding eleven (11) months thereafter, Borrower shall make monthly payments of principal of ELEVEN THOUSAND THREE HUNDRED TWENTY-FIVE DOLLARS ($11,325.00) on the Term Loan plus accrued interest at the applicable interest rate.    Commencing on December 26, 2004 and continuing on the same day of each succeeding eleven (11) months thereafter, Borrower shall make monthly payments of principal of TWELVE THOUSAND TWO HUNDRED DOLLARS ($12,200.00) on the Term Loan plus accrued interest at the applicable interest rate.    Commencing on December 26, 2005 and continuing on the same day of each succeeding eleven (11) months thereafter, Borrower shall make monthly payments of principal of THIRTEEN THOUSAND ONE HUNDRED FIFTY DOLLARS ($13,150.00) on the Term Loan plus accrued interest at the applicable interest rate.

Section 1.9    Interest Payment - Line of Credit Loan.    Commencing thirty (30) days after the Loan Opening Date and continuing on the same day of each succeeding month thereafter until the Maturity Date, Borrower shall make monthly payments of interest only on the outstanding principal balance of the Line of Credit Loan at the applicable interest rate.

Section 1.10    Late Charge.    Borrower further agrees to pay a "Late Charge" of five percent (5%) of any payments due hereunder if such amount is paid more than ten (10) days after the due date thereof, to cover the extra expense involved in handling delinquent payments. This provision shall not be deemed to excuse a late payment or be deemed a waiver of any other rights Lender may have, including the right to declare the entire principal and interest due on the Notes immediately due and payable.

Section 1.11    Payments.    All payments of principal and interest on the Loans and all payments of any other fees and costs due hereunder shall be made in immediately available funds. All such payments shall be made to Lender at its office in Chicago, Illinois, not later than 2:00 P.M., Chicago time, on the date due, and funds received after that hour shall be deemed to have been received by Lender on the next Business Day.

Section 1.12    Loan Commitment Fees.    Borrower shall pay to Lender (i) a non-refundable loan commitment fee for the Term Loan in the amount of FORTY-EIGHT THOUSAND DOLLARS ($48,000.00) (**"Term Loan Commitment Fee"**) and (ii) a non-refundable loan commitment fee for the Line of Credit Loan in the amount of FORTY TWO THOUSAND SIX HUNDRED SIXTY DOLLARS ($42,660.00) ("**Line of Credit Loan Commitment Fee**") (Term Loan Commitment Fee and Line of Credit Loan Commitment Fee are collectively "**Loan Commitment Fees**"). The unpaid balance of the Loan Commitment Fees shall be due and payable on or before the Closing Date.

# ARTICLE II

## LOAN DOCUMENTS; SECURED OBLIGATIONS

Section 2.1    Loan Documents. The Obligations shall be evidenced and secured by the Loan Documents, including the following documents, all dated as of the date hereof:

(a)    this Agreement;

(b)    that Term Note in the principal amount of NINE MILLION SIX HUNDRED THOUSAND DOLLARS ($9,600,000.00) given by Borrower to Lender and evidencing the Term Loan (together with any Amendments thereto, the **"Term Note"**);

(c)    that Line of Credit Note in the principal amount of FOUR MILLION TWO HUNDRED SIXTY-SIX THOUSAND DOLLARS ($4,266,000.00) given by Borrower to Lender and evidencing the Line of Credit Loan ("together with any Amendments thereto, the **"Line of Credit Note"**) (Term Note and Line of Credit Note are collectively "**Notes**");

(d)    that certain Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing from Borrower to Trustee (as defined in the Deed of Trust) for the benefit of Lender (together with any Amendments thereto, the **"Deed of Trust"**) encumbering the Property;

(e)    that certain Assignment of Leases and Rents from Borrower in favor of Lender encumbering the leases and rents at the Property;

(f)    that certain Security Agreement from Borrower in favor of Lender;

(g)    the Financing Statements;

(h)    that certain Guaranty from Guarantor in favor of Lender (together with any Amendments thereto, the **"Guaranty"**);

(i)    that certain Environmental Indemnity Agreement from Borrower and Guarantor in favor of Lender (together with any Amendments thereto, the **"Environmental Indemnity"**).

Section 2.2    Obligations. The grants, assignments, pledges, security interests, encumbrances and transfers made under and created pursuant to the Loan Documents are given for the purpose of securing (i) payment of the Debt; and (ii) the performance of all other agreements, covenants, conditions and obligations of Borrower and each other Loan Party contained herein or in the other Loan Documents (collectively, items (i) and (ii) are the **"Obligations"**).

# ARTICLE III

# REPRESENTATIONS AND WARRANTIES

Section 3.1    Representations and Warranties. The Recitals set forth above are made a part of this Article and constitute representations and warranties of Borrower to Lender. Borrower further represents and warrants to Lender as follows:

(a)    Loan Closing Conditions.  Borrower has fully satisfied and/or performed each of the Loan Closing Conditions as of the Closing Date.

(b)    Loan Documents.  Each of the Loan Documents is in full force and effect.

(c)    No Event of Default.  No Event of Default has occurred and, at the Closing Date, no Event of Default will have occurred immediately upon the funding of the Loans.

(d)    No Set-Off. The Loan Documents, and the performance of each Loan Party's obligations thereunder, are not subject to any right of rescission, set-off, counterclaim or defense by any Loan Party, including the defense of usury, nor would the exercise of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents or any remedy provided for thereunder unenforceable, and no Loan Party has asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

(e)    Lien of Loan Documents. Each of the Loan Documents which purports to grant or assign to Lender a Lien on any Collateral creates a valid, enforceable Lien on such Collateral in favor of Lender subject only to the Permitted Exceptions.

Upon the recording of the Deed of Trust and the recording and filing of the Financing Statements, Lender will have a perfected Lien on each item of Collateral.

(f)    Due Authorization; Enforceability.  Borrower has taken all necessary action to authorize the execution, delivery and performance of the Loan Documents, and no consent, authorization or approval of any Person is necessary to authorize each Loan Party to execute, deliver and perform his or her obligations under the Loan Documents to which each is a party. Each of the Loan Documents has been duly executed and delivered by or on behalf of each Loan Party, and constitutes the legal, valid and binding obligations of each Loan Party enforceable against each Loan Party in accordance with its terms.

(g)    No Conflicts. The execution, delivery and performance of the Loan Documents by each Loan Party does not and will not (i) conflict with, result in or cause any breach or violation under Applicable Law, (ii) conflict with or result in a breach of any term or provision of, or constitute a default under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which such Loan Party is bound or by which such Loan Party's property or assets are subject, (iii) result in the creation or imposition of any Lien (other than pursuant to the Loan Documents) upon any of the property or assets of

any Loan Party, or (iv) result in any violation of the provisions of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over such Loan Party or any of his or her properties or assets.

(h)     Consents.  No consent, approval, authorization or order of, or qualification with, any court or Governmental Authority or any other Person is required in connection with the Property and the execution, delivery or performance by any Loan Party of the Loan Documents.

(i)     No Litigation.   There are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or any other Person now pending or, to Borrower's Knowledge, threatened against or affecting the Property, any of the Collateral or any Loan Party.

(j)     No Restriction.  No Loan Party is in default (after any applicable notice and grace period) in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which he or she is a party which could result in a Material Adverse Change.

(k)     Financial Condition.  Each financial statement concerning each Loan Party and the Property provided to Lender from time to time fairly and accurately presents, in all material respects the financial position of each such Loan Party and the Property, as the case may be, as of the date of such financial statement.  Since the Closing Date, there have occurred no changes or circumstances which individually or in the aggregate have had or may result in a Material Adverse Change.

(l)     Fraudulent Transfer; Solvency. No assets of any Loan Party have been acquired through any transaction or series of transactions which could be deemed or determined to be a fraudulent transfer or conveyance under Applicable Law. No Loan Party has entered into the Loan Documents, with the actual intent to hinder, delay, or defraud any creditor or any other Person, and each Loan Party has received reasonably equivalent value in exchange for his or her obligations under the Loan Documents.  Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of each Loan Party's assets exceeds such Loan Party's total Indebtedness.  No Loan Party's assets constitute unreasonably small capital to carry out such Loan Party's business as conducted or as proposed to be conducted and no Loan Party has incurred, or intends or believes that said Loan Party will incur, Indebtedness beyond said Loan Party's ability to pay such Indebtedness as it matures (taking into account the timing and amounts to be payable on or in respect of his or her obligations).

(m)     No Bankruptcy Filing.  No Loan Party is a debtor in any outstanding action or proceeding pursuant to any Bankruptcy Law and no Loan Party is (i) contemplating either the filing of a petition under any Bankruptcy Law or the liquidation of all or any portion of his or her assets or property or (ii) aware that any other Person is contemplating the filing against any Loan Party of a petition under any Bankruptcy Law.

(n)    Title.  At closing, Borrower will have good and marketable fee simple title to the Property free and clear of all liens, encumbrances and charges whatsoever other than Permitted Exceptions and the Liens created by the Loan Documents in favor of Lender.

(o)    Flood Zone.  No portion of the Property is located in an area as identified by the Federal Emergency Management Agency or the Federal Insurance Administration as an area having special flood hazards (Zones A, B or Zone V).

(p)    Access.  The Property has adequate rights of access to dedicated public ways either abutting the Property or through Easement Areas (and makes no use of any means of access, ingress or egress that is not pursuant to such dedicated public ways or Easement Areas). Without limiting the foregoing, all roads necessary for the full utilization of the Property as currently used (i) have been completed and paid for and dedicated to public use and accepted by the applicable Governmental Authority or (ii) are part of the Property. Vehicular and pedestrian access (including curb cuts) to and from the Property will be permitted to all such streets, roads or highways as shown on the Survey.

(q)    Utilities.  The Property is served by water, electric, gas, sewer, sanitary sewer and storm drain facilities and all other utilities necessary and sufficient for its current and intended use, and such utilities enter the Property directly from a public right-of-way abutting the Property or through Easement Areas, and all such utilities are connected so as to serve the Property without passing over other property other than Easement Areas.

(r)    No Encroachments.  The improvements at the Property lie wholly within the boundaries and building restriction lines of the Property and do not encroach upon easements or other encumbrances upon the Property, including any required set-back, and no improvements on adjoining properties encroach upon the Property.

(s)    Compliance with Applicable Law; Zoning.  The Property is in compliance with, and has been designed, constructed and completed, in compliance with, Applicable Law. The Property is presently zoned to permit its current use. The Property complies with all zoning requirements and does not rely on a any pre-existing use or rights.

(t)    Permits and Licenses.  All licenses and permits currently required for the Property have been obtained, paid for and are in full force and effect.

(u)    Forfeiture.  There has not been committed by any Loan Party any act or omission affording any Governmental Authority the right of forfeiture as against (i) the Property or any part thereof, or (ii) any Ownership Interest or (iii) any monies paid in performance of the Obligations or (iv) any license or permit for the Property. No Loan Party has purchased the Property or any portion thereof or interest therein or his or her Ownership Interest with the proceeds of any illegal activity.

(v)    Casualty. The Property has not been damaged or injured as a result of any Casualty.

(w)    No Condemnation. No Condemnation proceedings have been commenced, or, to the Borrower's Knowledge, is threatened against the Property or any roadways or Easement Areas providing access to the Property.

(x)    No Violations. No Loan Party has received any notice of violations of any Applicable Law in respect of the Property.

(y)    Insurance. Policies satisfying the insurance coverages, amounts and other requirements set forth in this Agreement are in full force and effect and, to Borrower's Knowledge, no Person, has done, by act or omission, anything which would impair the coverage of any Policy.

(z)    Separate Tax Lot. The Property consists of separate tax lots and said lots do not include any property not included within the Property.

(aa)    ERISA. No Loan Party or any ERISA Affiliate of a Loan Party is an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA, and none of the assets any Loan Party constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3 101. The consummation of the transaction contemplated hereby will not constitute or result in any transaction prohibited by Section 406 of ERISA or Section 4975 of the Code.

(bb)    Margin Stock. No Loan Party is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock, and no proceeds of the Loans will be used for a purpose which violates, or would be inconsistent with Federal Reserve System Board of Governors' Board Regulation U or X (as such terms are used in Federal Reserve System Board of Governors' Board Regulation U or X or any regulations substituted therefor, as from time to time in effect), or for any purposes prohibited by Applicable Law or by the terms and conditions of the Loan Documents.

(cc)    Foreign Person. No Loan Party is a "foreign person" within the meaning of § 1445(f)(3) of the Internal Revenue Code.

(dd)    Full and Accurate Disclosure. No statement of fact made by or on behalf any Loan Party in any Loan Document contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no fact known to any Loan Party which has not been disclosed in writing to Lender which has resulted in or may result in a Material Adverse Change. All reports, documents, instruments, information and forms of evidence delivered to Lender concerning the Loans or security for the Loans or required by the Loan Documents are accurate, correct and sufficiently complete to give Lender true and accurate knowledge of their subject matter, and do not contain any material misrepresentation or omission.

(ee)   Use of Loan Proceeds.  Borrower shall use the proceeds of (i) the Term Loan to acquire the Property and, (ii) the Line of Credit Loan to fund the completion of the Improvements and to pay leasing commissions.

Section 3.2   Representations and Warranties to be Continuing.   Borrower hereby covenants and agrees that all of the representations and warranties in **Section 3.1** are true and correct as of the Closing Date and will continue to be true throughout the term of the Loans and any extensions thereof as if remade at all times afterwards. All representations and warranties made in this Agreement or in any other document delivered to Lender by or on behalf of any Loan Party shall survive the making of the Loans and shall continue in full force and effect until the Obligations are fully satisfied. Borrower shall inform Lender in writing immediately upon discovering any breach of such representations or warranties.

Section 3.3   Acknowledgment of Lender's Reliance.   Borrower acknowledges that the Loans will be made by Lender in reliance upon the representations and warranties contained in the Loan Documents or any certificate delivered to Lender pursuant to the Loan Documents. Lender shall be entitled to such reliance notwithstanding any investigation which has been or will be conducted by Lender or on its behalf.

## ARTICLE IV

## CONDITIONS PRECEDENT TO LOAN CLOSING

Section 4.1   Loan Closing Conditions. The obligation of Lender to make the Loans on the Closing Date is subject to the fulfillment by Borrower of the following conditions precedent (**"Loan Closing Conditions"**) no later than the Closing Date, each in form and substance satisfactory to Lender (but if any Loan Closing Condition is not fully satisfied by the Closing Date and Lender elects, in its sole and absolute discretion, to proceed with funding of the Loans, no such unsatisfied Loan Closing Condition shall be deemed waived (at such time or any other time) unless Lender gives Borrower written notice that it is permanently waiving any such Loan Closing Condition:

(a)   Loan Documents.  Lender shall have received the Loan Documents, in each case, duly executed, delivered and, where appropriate, acknowledged by each applicable Loan Party.

(b)   Representations and Warranties.  The representations and warranties of each Loan Party contained in the Loan Documents shall be true and correct on and as of the Closing Date.

(c)   No Event of Default.  No Event of Default or Unmatured Default shall have occurred and shall be continuing; and each Loan Party shall be in compliance with all terms and conditions set forth in each Loan Document on his or her part to be observed or performed.

(d)    Material Adverse Change.  No event or series of events shall have occurred which has resulted in or is reasonably likely to result in a Material Adverse Change.

(e)    Casualty.  No Casualty has occurred or Condemnation proceeding has been initiated, which in Lender's sole and absolute discretion, could result in a Material Adverse Change.

(f)    Closing Expenses.  Lender shall have received reimbursement for all of Lender's Closing Expenses.

(g)    Required Deliveries.  Lender shall have received, reviewed and approved each of the items set forth on **Exhibit C** attached hereto, each of which shall be in form and content acceptable to Lender.

(h)    Asbestos Remediation.  Lender shall have received, reviewed and approved, in its sole discretion, a report from Borrower regarding the remediation of the asbestos at the Property.

## ARTICLE V

## PROCEDURES AND CONDITIONS FOR LINE OF CREDIT LOAN ADVANCES

This Article contains terms, conditions and delivery requirements which pertain to all Line of Credit Loan Advances under this Agreement.  These terms, conditions and delivery requirements are in addition to those set forth elsewhere in this Agreement.

Section 5.1    Equity Requirement.  Before Lender will authorize Advances of the Line of Credit Loan, Lender shall have received satisfactory evidence of Borrower's payment of additional equity for the Improvements in the amount of FOUR HUNDRED SEVENTY-FOUR THOUSAND DOLLARS ($474,000.00).

Section 5.2    Line of Credit Loan Advance Limitations.  Provided no Event of Default exists, Borrower may request from Lender Advances of the Line of Credit Loan as follows:

(a)    in an amount up to FOUR HUNDRED THOUSAND DOLLARS ($400,000.00) to complete certain general cosmetic Improvements, asbestos removal and to pay leasing commissions; and

(b)    in an amount up to THREE MILLION EIGHT HUNDRED SIXTY-SIX THOUSAND DOLLARS ($3,866,000.00) to complete the remaining Improvements and to pay leasing commissions.  All Advances of the Line of Credit Loan pursuant to this **Section 5.2(b)** shall be subject to Borrower providing Lender with new Leases in accordance with **Section 7.13** herein. The amount of each Line of Credit Loan Advance for the Improvements for new Leases shall be in an amount equal to the lesser of (i) one hundred percent (100%)

of Borrower's cost of the Improvements as reasonably determined by Lender, or (ii) Twenty-Five Dollars ($25.00) per square foot of leased space.

Section 5.3    Requests For Advances.

(a)    Use of Line of Credit Loan.  Borrower may request Line of Credit Loan Advances only for payment towards the completion of the Improvements and leasing commissions.

(b)    Line of Credit Loan Advances.  All requests for Line of Credit Loan Advances must be submitted to Lender not less than five (5) Business Days prior to the proposed date for such Line of Credit Loan Advance, must be in writing, must be for a date which is a Business Day occurring on or before the Maturity Date, and must include all documents required herein.

Section 5.4    Conditions for Advances.  Lender's approval of each Line of Credit Loan Advance shall be subject to the satisfaction, compliance or prior written waiver by Lender of the following conditions:

(a)    Representations and Warranties.  The representations and warranties of each Loan Party contained in the Loan Documents shall be true and correct as if remade on the date of each Line of Credit Loan Advance.

(b)    No Event of Default.  No Event of Default or Unmatured Event of Default shall have occurred and be continuing, and each Loan Party shall be in compliance with all terms and conditions set forth in each Loan Document on his or her part to be observed or performed.

(c)    Material Adverse Change.  No event or series of events shall have occurred which has resulted in a Material Adverse Change.

(d)    Date Down Endorsements.  Lender shall have received a "date down" endorsement to the Lender's Title Insurance Policy extending the coverage to include the date and amount of the requested Line of Credit Loan Advance.  Such title update endorsements shall also show no exceptions to title other than the Permitted Exceptions.

(e)    Leases.  Lender shall have received and approved all Leases for Advances requested pursuant to **Section 5.2(b)**.

(f)    Other Documentation.  Lender shall have received and approved the plans and specifications for the Improvements which are the subject of each Advance.  In addition, Lender shall have received and approved the owner's sworn statement for the Improvements which are the subject of each Advance and all lien waivers, paid invoices, and such other documentation requested by Lender or the Title Company in connection with the Advance.

Section 5.5    Disbursement of Line of Credit Loan.

    (a)    Improvements.  If Lender so elects, Lender shall make Line of Credit Loan Advances through a Construction Escrow on terms acceptable to Lender ("**Construction Escrow**").

    (b)    Direct Disbursements.  Lender reserves the right to make disbursements for payment of the Improvements and leasing commissions directly to Borrower, Lender or its consultants or upon the occurrence of an Unmatured Default or Event of Default, any other Person entitled to receive payment.

    Section 5.6    Representation and Warranty Upon Disbursement.  The acceptance by Borrower of any Line of Credit Loan Advance shall constitute Borrower's representation and warranty to Lender that all terms, conditions and requirements under the Loan Documents pertaining to such Line of Credit Loan Advance have been satisfied as of the date of such Line of Credit Loan Advance.

**ARTICLE VI**

**CONSTRUCTION COVENANTS**

Section 6.1    Construction Obligations.

    (a)    General Obligation.  Borrower shall commence and thereafter prosecute construction of the Improvements with good faith and due diligence in compliance with the Loan Documents.

    (b)    Compliance.  All Improvements will be done free of defects and in a good and workmanlike manner with materials which are new and of high quality.  All Improvements shall be done in strict compliance with Applicable Law.  The Improvements will be equipped with fixtures, equipment and other personal Property which are new and of high quality.  All materials and labor purchased and employed for the Improvements shall be used solely for the Improvements and no other purpose.

    (c)    Payment.  Borrower shall pay for all Improvements as they become due and owing, notwithstanding that Lender may not be obligated to make a Line of Credit Loan Advance hereunder or that the amount of any particular Line of Credit Loan Advance may be insufficient to pay such costs, and Borrower shall pay from her own funds any deficiency. Borrower shall promptly discharge of record within ten (10) days after the filing thereof any lien arising from the Improvements or otherwise.

Section 6.2    Inspection and Construction Reports.

    (a)    Inspection.  Borrower will at all times permit Lender and Lender's consultants and agents to inspect the Property and all matters relating to the Improvements during normal

business hours. Borrower will, and will cause each Contractor Party to, cooperate to give Lender and its consultants and agents full access to the Property at all times. Lender's inspection and/or approval of an item shall not result in any waiver of Lender's rights in the event such item does not conform with this Agreement.

(b)     Reports and Notices. Promptly upon receipt thereof, Borrower shall provide Lender with copies of (i) all material inspections, reports, test results and other information received by Borrower from time to time from her employees, agents, representatives, architects, engineers, consultants, advisors, any Contractor Party or any other Persons involved in the Property, (ii) any notices pertaining to the Improvements from any Contractor Party or tenant and (iii) any notice that any Loan Party receives from any Governmental Authority or any insurance company providing insurance in connection with the Property.

## ARTICLE VII

## ADDITIONAL BORROWER'S COVENANTS

Borrower covenants and agrees as follows:

Section 7.1     Insurance.

(a)     Property Insurance. Borrower, at her sole cost and expense, shall insure and keep insured the Property against such perils and hazards, and in such amounts and with such limits, and pursuant to such policies issued by such insurers, as set forth in the Deed of Trust.

(b)     Contractor's Insurance. Upon the request of Lender, Borrower shall furnish to Lender certificates from the insurance carrier for each Contractor Party evidencing worker's compensation, employers' liability, commercial auto liability, excess umbrella liability coverage and commercial general liability insurance (including contractual liability and completed operations coverage) written on a standard "ISO" occurrence basis form or its equivalent, with general liability insurance limits as Lender may reasonably require. Lender shall be named as an additional insured under such liability Policies. Borrower shall cause each subcontractor to maintain commercial general liability, commercial automobile liability, workers' compensation, employers' liability, and excess umbrella liability coverage in form and amount satisfactory to Lender.

Section 7.2     Title to Property. Borrower shall warrant and defend title to the Collateral and the Property and every part thereof, and the validity and priority of the liens and security interests created by the Loan Documents against the claims of all Persons whatsoever. Borrower shall reimburse Lender for any losses, costs, damages or expenses (including reasonable attorneys' fees) incurred by Lender if an interest in the Property or the Collateral is claimed by another Person, and any amounts expended by Lender in respect of such losses, costs, damages or expenses shall be deemed a Protective Advance.

Section 7.3 <u>Zoning</u>. Borrower will cause the Property to be in compliance with Applicable Law. Without limiting the generality of the foregoing, Borrower shall not initiate, join in, acquiesce in, or consent to any change in, or modification or qualification of, any private or public restrictive covenant, zoning law or other restriction, limiting, conditioning, changing, qualifying or defining the uses which may be made of the Property or any part thereof without the prior written consent of Lender. If under applicable zoning provisions, the use of all or any portion of the Property is or shall become a nonconforming use, Borrower will not cause or permit the nonconforming use to be discontinued or abandoned without the prior written consent of Lender.

Section 7.4 <u>Recorded Documents</u>. Without the prior written consent of the Lender, Borrower shall not permit or cause any other Person to, record any map, plat, parcel map, lot line adjustment or other subdivision map, easement, reciprocal easement agreement, declaration or any other recorded document of any kind covering any portion of the Property, or any amendment to any of the foregoing. Any default, breach or violation of this **Section 7.4** shall be an automatic Event of Default (without any notice, grace or cure period).

Section 7.5 <u>Maintenance of the Property and Ownership Obligations</u>. Borrower shall maintain the Property in a good and safe condition and repair. The improvements at the Property shall not be removed, demolished or materially altered without the prior written consent of Lender.

Section 7.6 <u>Taxes and Liens</u>.

(a) <u>Taxes and Other Charges</u>. Borrower shall promptly pay all taxes, assessments, governmental licenses and impositions, and other similar charges (the **"Taxes"**), all ground rents, maintenance charges, charges for utility services and similar charges (the **"Other Charges"**), in each case now or hereafter levied or assessed or imposed against the Property or any part thereof as same become due and payable. Borrower will deliver to Lender, promptly upon Lender's request, evidence satisfactory to Lender that the Taxes and Other Charges have been so paid or are not then delinquent. Borrower shall furnish to Lender paid receipts for the payment of the Taxes and Other Charges prior to the date the same shall become delinquent.

(b) <u>Liens</u>. Subject to **Section 7.6(c)** below, Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien (other than Permitted Exceptions) against the Collateral or the Property or any portion thereof.

(c) <u>Contest</u>. After prior written notice to Lender, Borrower, at her own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any of the Taxes, Other Charges or any Lien (other than the Lien of the Loan Documents) provided that, and only for so long as (1) no Event of Default exists; (2) neither any Collateral nor the Property or any part thereof or interest therein will in the opinion of Lender be in danger of being sold, forfeited, terminated, canceled or lost; (3) in the case of Taxes, Borrower has paid the same before delinquent even though they are contesting the same; (4) such contest shall be permitted under and be conducted in accordance with Applicable Law and in accordance

with the provisions of any other instrument or agreement affecting the Property to which Borrower is subject and shall not constitute a default thereunder; (5) Borrower promptly pays any contested amount if and to the extent the outcome of such contest requires the payment of the same; and (6) unless Borrower shall have paid the same under protest, at Lender's option Borrower shall have either (i) deposited with Lender adequate cash reserves for the payment thereof, together with all interest and penalties which may accrue thereon, or (ii) furnished to Lender such other security Lender may deem adequate to insure the payment of such contested amounts together with all interest and penalties which may accrue thereon; provided, however, Lender agrees that Borrower may satisfy the requirements of this clause (6) by obtaining in favor of Lender an indemnity (in form and content acceptable to Lender) from the Title Company or other surety acceptable to Lender in respect of any Lien being contested by Borrower.

Section 7.7 <u>Waste</u>. Borrower shall not, (a) commit or suffer any waste of the Property, (b) make or permit to be made any change in the use of the Property which will in any way materially increase the risk of fire or other hazard, (c) take or cause to be taken any action that might invalidate or give cause for cancellation of any Policy, or (d) do or permit to be done thereon anything that could in any way impair the value of the Property or any Collateral. Any default, breach or violation of this **Section 7.7** shall be an automatic Event of Default (without any notice, grace or cure period).

Section 7.8 <u>Compliance With Laws</u>. Borrower shall promptly comply with all Applicable Law relating to the Property. Borrower shall give prompt notice to Lender of the receipt by Borrower of any notice related to a violation of any Applicable Law and of the commencement of any proceedings or investigations which relate to compliance with Applicable Law.

Section 7.9 <u>Books and Records</u>.

(a) <u>Inspections</u>. Borrower will keep and maintain proper and accurate books, records and accounts reflecting her financial affairs. Lender and its consultants shall have the right from time to time at all times during normal business hours to examine such books, records and accounts at the office of Borrower or other Person maintaining such books, records and accounts and to make copies or extracts thereof as Lender shall desire. Any default, breach or violation of this **Section 7.9(a)** which continues after ten (10) days notice from Lender of such default, breach or violation shall be an automatic Event of Default (without any further notice, grace or cure period).

(b) <u>Financial Reports</u>. Borrower shall deliver or cause to be delivered to Lender each of the following:

(i) <u>Annual Reports</u>. Within ten (10) days after completion but in no event later than one hundred twenty (120) days of the close of each calendar year during the term of the Loans, certified copies of the internally prepared financial statements for the Property, prepared in accordance with generally accepted accounting principles consistently applied, including a statement of operations (profit and loss), a statement of cash flows, a calculation of Net Operating Income, a balance

sheet and such other information as is reasonably required by Lender. Each balance sheet furnished under this paragraph shall be accompanied by a schedule categorizing the assets and liabilities set forth in each such balance sheet as either current assets or liabilities or long-term assets or liabilities, as the case may be.

(ii)    Loan Party Financials.   On or before April 30th of each year during the term of the Loans, a personal financial statement for each of the Loan Parties in a form acceptable to Lender.

(iii)    Tax Returns.  Within ten (10) days after the due date thereof, copies of all tax returns filed with respect to each Loan Party.

(iv)    Rent Roll.    Within thirty (30) days following the end of each calendar year, a certified copy of the updated rent roll for the Property in a form reasonably acceptable to Lender;

(v)    Other Information.  Within ten (10) days after request, such further detailed information covering the Property and the financial affairs of any Loan Party, as may be reasonably requested by Lender.

Any default, breach or violation of this **Section 7.9(b)** which continues after ten (10) days notice from Lender of such default, breach or violation shall be an automatic Event of Default (without any further notice, grace or cure period).

(c)    Litigation.    Borrower shall give prompt written notice to Lender of any litigation or governmental proceedings pending against the Property or any Loan Party.

(d)    Bankruptcy.    Borrower shall give prompt written notice to Lender of any voluntary or involuntary bankruptcy, reorganization, insolvency or similar proceeding under any Bankruptcy Law against any Loan Party.

Section 7.10    Continued Existence.  Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, and material rights, licenses, permits and franchises in compliance with Applicable Law. Any violation of this **Section 7.10** which continues for ten (10) days after Borrower's Knowledge of such default, breach or violation (commencing from the date such knowledge was first obtained) shall be an automatic Event of Default (without any further notice, grace or cure period).

Section 7.11    Additional Ownership Covenants.  Except as set forth in **Section 8.2**, until the Debt and the Obligations have been fully paid and performed, there shall be no changes in the ownership, control or management of Borrower without the prior written consent of Lender.

Section 7.12    Bank Accounts.  Throughout the term of the Loans, the primary operating deposit accounts for the Property shall be maintained with Lender.

Section 7.13    Leases.  Borrower has delivered to Lender true, correct and complete copies of all Leases for the Property which have been executed on or before the Closing Date.  Borrower shall not, without Lender's prior written consent, suffer, permit or enter into any Lease of all or any portion of the Property.  In addition, Borrower shall not, without Lender's prior written consent, modify or amend any Lease or cancel, terminate or surrender any Lease.  Further, all new Leases or renewals of existing Leases shall be for a minimum term of five (5) years and at a rent of at least FOURTEEN AND 50/100 DOLLARS ($14.50) per square foot gross.  Any consent given by Lender or any waiver of a default under this **Section 7.13** shall not constitute a consent to or waiver of any rights, remedies or powers of Lender arising as a result of any subsequent default hereunder.

Section 7.14    Debt Service Coverage Ratio.  During the term of the Loans, the Property shall maintain a Debt Service Coverage Ratio for the Loans of not less than 1.2:1.00.

Section 7.15    Property Manager.  At any time during the term of the Loans, Lender shall have the right, in its sole discretion, upon written notice to Borrower, to require Borrower to employ a third party management company acceptable to Lender for the management and leasing of space at the Property.

Section 7.16    Minimum Liquidity.  During the term of the Loans, the Loan Parties shall maintain aggregate "**Liquid Assets**" (as hereinafter defined) of at least TWO MILLION DOLLARS ($2,000,000.00).  As used herein, "Liquid Assets" means cash, marketable securities or availability on personal line(s) of credit.

Section 7.17    Repairs.  On or before sixty (60) days after the Closing Date, Borrower shall, at Borrower's sole cost, repair and/or replace the deteriorating concrete panels on the exterior of the garage of the Property and shall provide Lender with such documents as Lender shall require indicating that said work has been completed including, without limitation, paid invoices and lien waivers.

## ARTICLE VIII

## ASSIGNMENTS, SALE AND ENCUMBRANCES

Section 8.1    Lender's Right to Assign.  Lender may assign, negotiate, pledge or otherwise hypothecate this Agreement, including the Notes, and other Loan Documents to any bank, participant or financial institution, and in case of such assignment, Borrower will accord full recognition thereto and agrees that all rights and remedies of Lender in connection with the interest so assigned shall be enforceable against Borrower by such bank, participant, or financial institution with the same force and effect and to the same extent as the same would have been enforceable by Lender but for such assignment.

Section 8.2    Prohibition of Assignments and Encumbrances by Borrower.  Borrower shall not, without the prior written consent of Lender, create, effect, consent to, attempt, contract for, agree to make, suffer or permit any Prohibited Transfer (as defined herein).  Any conveyance, sale, assignment, lease, transfer, lien, pledge, mortgage, security interest or other encumbrance or

alienation, or attempt to do any of the foregoing, of any of the following rights, properties or interests which occurs, is granted, accomplished, attempted or effectuated without Lender's prior written consent shall constitute a "Prohibited Transfer" hereunder:

(a)     Borrower's interest under the Loan Documents or in the Property, or any part thereof, interest therein or earnings thereon, excepting only sales or other dispositions of collateral no longer useful in connection with the operation of the Property (herein called "Obsolete Collateral"), provided that prior to the sale or other disposition thereof, such Obsolete Collateral has been replaced by collateral of at least equal value and utility and subject to the liens and security interests of the Loan Documents with the same priority as such liens and security interests in the collateral disposed of;

(b)     If Borrower, any beneficiary of a trustee borrower, any general partner in a partnership borrower or partnership or joint venturer in a joint venture borrower which is a beneficiary of a trustee borrower is a corporation or any owner of substantially all of the stock of such corporation is itself a corporation (other than a corporate trustee or a corporation whose stock is publicly traded on a national securities exchange or on the National Association of Securities Dealer's Automated Quotation System), any shares of capital stock of such corporation; or

(c)     If Borrower, or any beneficiary of a trustee borrower is a partnership or joint venture or limited liability company, all or any part of the partnership or joint venture or membership interest, as the case may be, in such partnership, joint venture or limited liability company;

in each case whether any such conveyance, sale, assignment, transfer, lien, pledge, mortgage, security interest, encumbrances or alienation is effected directly, indirectly, voluntarily or involuntarily, by operation of law or otherwise; provided, however, that the foregoing provisions of this paragraph shall not apply (i) to liens in favor of Lender securing the Indebtedness, or (ii) to the lien of current taxes and assessments not in default.

## ARTICLE IX

## DEFAULTS; REMEDIES

Section 9.1    Events of Default. The term **"Event of Default"** as used in this Agreement shall mean the occurrence of any one or more of the following events set forth in this **Section 9.1**:

(a)     (i) Borrower shall fail to make any payment to Lender under the Loan Documents when due and payable, and Borrower's failure to make such payment shall continue for ten (10) days (inclusive of the first day such payment was due), except that no grace or cure period shall apply to payment of any amounts due on the Maturity Date, or (ii) Borrower shall fail to pay the entire Debt or any portion thereof on the Maturity Date; or

(b) Any failure of Borrower for a period of thirty (30) days (except as to Defaults specified elsewhere in this **Section 9.1** or where a longer or shorter period is specified herein or in the other Loan Documents for a particular default) after written notice from Lender to Borrower to observe or perform any of the covenants of Borrower under the terms of this Agreement or any other of the Loan Document except payment of the Notes;

(c) The occurrence of a Prohibited Transfer;

(d) The existence of any collusion, fraud, dishonesty or bad faith by or with the acquiescence of any Loan Party which in any way relates to or affects the Loans or the Property;

(e) If at any time any representation, statement, report or certificate made now or hereafter by any Loan Party is not true and correct in any material respect, or any statement or representation made in the loan application submitted to Lender for the Loans is not true and correct in any material respect;

(f) If all or a substantial part of the assets of any Loan Party is attached, seized, subjected to a writ or distress warrant, or is levied upon, unless such attachment, seizure, writ, warranty or levy is vacated within thirty (30) days;

(g) If any Loan Party is enjoined, restrained or in any way prevented by court order from performing any of his or her obligations hereunder or under the other Loan Documents or conducting all or a substantial part of his or her business affairs; or if a proceeding seeking such relief is not dismissed within sixty (60) days of being filed or commenced; or if proceedings are commenced by any public or quasi-public body to acquire a material portion of the Property or any interest therein by power of condemnation or eminent domain and such proceedings are not dismissed within sixty (60) days of the commencement date;

(h) If a notice of lien, levy or assessment is filed of record with respect to all or any part of the property of any Loan Party by the United States, or any other governmental authority not released within twenty (20) days;

(i) If there occurs a material adverse change in the financial condition of any Loan Party;

(j) Default in the payment when due (subject to any applicable cure period), whether by acceleration or otherwise, of any other indebtedness for borrowed money of, or guaranteed by, any Loan Party or default in the performance or observance of any obligation or condition with respect to any such other indebtedness if the effect of such default is to accelerate the maturity of any such indebtedness, or to permit the holder or holders thereof, or any trustee or agent for such holders, to cause such indebtedness to become due and payable prior to its expressed maturity date;

(k)     If any Loan Party:

(i)     Shall file a voluntary petition in bankruptcy or for arrangement, reorganization or other relief under any chapter of the Federal Bankruptcy Code or any similar law, state or federal, now or hereafter in effect;

(ii)    Shall file an answer or other pleading in any proceedings admitting insolvency, bankruptcy, or inability to pay his or her debts as they mature;

(iii)   Shall have any involuntary proceeding under the Federal Bankruptcy Act or similar law, state or federal, now or hereafter in effect, filed against any one of them, and such proceedings shall not have been vacated within sixty (60) days after the filing thereof;

(iv)    Shall have an order appointing a receiver, trustee or liquidator entered against any of them or for all or a major part of his or her property or the Property and the same shall not have been vacated within sixty (60) days following entry thereof;

(v)     Shall be adjudicated a bankruptcy;

(vi)    Shall make an assignment for the benefit of creditors or shall admit in writing his or its inability to pay his or her debts generally as they become due or shall consent to the appointment of a receiver or trustee or liquidator of all or the major part of his or her property, or the Property; or

(vii)   Is a firm, partnership, limited liability company or corporation and said firm, partnership, limited liability company or corporation is dissolved, terminated or merged; or

(viii)  Is an individual, and said individual shall die or be adjudicated incompetent.

it being understood and agreed that if any event or circumstance occurs or exists which is an Event of Default under any one subsection of subsections (a) through (l) (inclusive) of this **Section 9.1**, then an "Event of Default" under the Loan Documents shall automatically exist (and shall be deemed continuing) regardless of whether any other term or provision of any Loan Document provides for any, or for any different, notice, grace and/or cure period, in which case such other notice, grace or cure period shall be void and of no force or effect.

Section 9.2    Remedies.

(a)     Upon the occurrence of any Event of Default, Borrower agrees that Lender may (but without any obligation to do so) take such action, without notice or demand, as Lender deems advisable to protect and enforce its rights against Borrower and in and to the

Collateral, including, but not limited to, the following actions, each of which may be pursued concurrently, separately or otherwise, at such time and in such order as Lender may determine, in its sole and absolute discretion, without impairing or otherwise affecting the other rights and remedies of Lender (and any and all costs and expenses, including reasonable attorneys' fees, paid or incurred by Lender in connection with the following shall constitute a Protective Advance):

(i)     declare the entire unpaid Debt to be immediately due and payable without any further notice, demand or other action by Lender;

(ii)     institute proceedings, judicial or otherwise, or take any other action, for the enforcement of Lender's rights under the Loan Documents or at law or in equity, including the appointment of a receiver, the foreclosure, auction or sale (public or private) of the Collateral or any portion thereof;

(iii)     terminate, in whole or in part, any obligation Lender may have hereunder or under any other Loan Document, including any obligation to make any Advance hereunder;

(iv)     institute an action, suit or proceeding in equity for the specific performance of any of the Obligations;

(v)     pay, perform, or cause the performance of any of the Obligations, complete construction of any work at the Property, in each case in its own name or in the name of Borrower, it being understood and agreed that Borrower hereby grants to Lender a power of attorney coupled with an interest to take any such action;

(vi)     recover judgment on the Notes either before, during or after any proceedings for the enforcement of any other Loan Document;

(vii)     exercise any and all rights and remedies granted to a secured party upon default under the applicable Uniform Commercial Code;

(viii)     exercise all or any one or more of the rights, powers and other remedies available to Lender under the Loan Documents, at law or in equity, at any time and from time to time, whether or not all or any portion of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceedings or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to the Collateral;

(ix)     apply any sums held by the Lender, or held in escrow or otherwise by Lender belonging to any Loan Party to the payment of the Debt; and

(x)     pursue such other remedies and rights as Lender may have under Applicable Law or at equity or available under the Loan Documents.

(b)    Proceeds.  The proceeds of any disposition of the Collateral, or any part thereof, or any other sums collected by Lender pursuant to the Loan Documents (including the collection of rents), may be applied by Lender to the payment of the Debt or any part thereof in such priority and amounts as Lender in its sole and absolute discretion shall determine.

(c)    Lender Action.  Upon the occurrence of any Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Borrower or any other Loan Party and without releasing Borrower or any other Loan Party from any Obligation, take any action in such manner and to such extent as Lender may deem necessary to protect the Collateral and/or take any action to cure any Event of Default. Borrower, for herself and on behalf of each of the Loan Parties, agrees that Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring an action or proceeding to protect its interest in the Property or to collect the Debt, and the cost and expense thereof (including reasonable attorneys' fees), shall constitute a Protective Advance and shall be payable on demand.

(d)    No Further Right to Cure.  Once an Event of Default has occurred hereunder, such Event of Default shall be deemed continuing hereunder regardless of whether any Loan Party, Lender, or any other Person has taken any action to remedy or cure the cause of such Event of Default.

(e)    No Waiver, Etc.  The failure of Lender to insist upon strict performance of any term, covenant or condition contained herein or in the other Loan Documents shall not be deemed to be a waiver, modification, amendment or estoppel thereof and no Loan Party or other Person shall be entitled to rely on such action or inaction.  Neither Borrower nor any other Loan Party shall be relieved of or released from its Obligations by reason of (i) the failure of Lender to comply with any request of any Loan Party to take any action to enforce any of the provisions hereof or any other Loan Document, (ii) the release, regardless of consideration, of the whole or any part of the Collateral, or of any Person liable for the Debt or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Loan Documents. Lender may resort for the payment of the Debt to any Collateral held by Lender in such order and manner as Lender, in its sole and absolute discretion, may elect.  Lender may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to recover against the Collateral under the Loan Documents. The rights of Lender under each of the Loan Documents shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others.  No act of Lender shall be construed as an election to proceed under any one provision of any Loan Document to the exclusion of any other provision. Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

# ARTICLE X

# MISCELLANEOUS

Section 10.1 <u>Further Assurances</u>. Borrower forthwith upon the execution and delivery of this Agreement and thereafter from time to time at Lender's request, will cause any of the Loan Documents (including any additional Financing Statements or continuation statements) to be filed, registered or recorded in such manner and in such places as may be required or permitted by any Applicable Law in order to publish notice of and fully protect, perfect or continue the perfection of any Lien in favor of Lender and the interest of Lender in the Collateral. In addition, Borrower will, at her sole cost and expense, (i) do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered all and every such further acts, deeds, conveyances, mortgages assignments, financing statements, continuation statements, notices of assignments, transfers and assurances as Lender shall, from time to time, require, for the better assuring, carrying out, conveying, assigning, transferring, pledging, hypothecating, perfecting, preserving and confirming unto Lender the Liens and other property rights granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted or transferred, or intended now or hereafter so to be, under the Loan Documents, or which Borrower or any other Loan Party may be or may hereafter become bound to convey, assign, transfer, pledge, or hypothecate to Lender, or for carrying out the intention or facilitating the performance of the terms of the Loan Documents and (ii) furnish or cause to be furnished to Lender all instruments, documents, surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished by Borrower or any other Loan Party pursuant to the terms of the Loan Documents or reasonably requested by Lender in connection therewith. Borrower and each other Loan Party, on demand, will execute and deliver one or more financing statements or other instruments, to evidence more effectively the security interest of Lender in the Collateral. In addition, Borrower hereby authorizes Lender to execute any such financing statements or other instruments without the signature of Borrower or any Loan Party (where permitted by Applicable Law) or to execute such financing statements and other instruments in the name of Borrower or such Loan Party and Borrower hereby grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of carrying out the provisions of this **Section 10.1.**

Section 10.2 <u>Estoppel Certificates</u>.

(a) <u>Borrower Estoppel Certificates</u>. Borrower, within ten (10) days after request by Lender, shall furnish to Lender a current written statement, dated as of the date of Borrower's response, duly acknowledged and certified, setting forth (i) the amount of the Debt, (ii) the rate or rates of interest on the Notes, (iii) the terms of payment and Maturity Date of the Notes, (iv) the date installments of interest and/or principal were last paid, (v) a list of all the Loan Documents, (vi) that, except as specifically provided in such statement and to Borrower's Knowledge, there are no defaults or events which with the passage of time or the giving of notice or both, would constitute an Event of Default under the Loan Documents, (vii) that the Loan Documents are valid, legal and binding obligations of each applicable Loan Party, enforceable against each such Loan party in accordance with its terms

and have not been modified or if modified, giving particulars of such modification, (viii) whether any offsets or defenses exist against the Obligations and, if any are alleged to exist, a detailed description thereof, and (ix) as to any other matters reasonably requested by Lender (**"Borrower Estoppel Certificates"**).

(b)     Tenant Estoppel Certificates.  Borrower, within thirty (30) days after request by Lender, shall furnish to Lender a current written statement (**"Tenant Estoppel Certificates"**), the forms of which are attached hereto as **Exhibit D** attached hereto and made a part hereof or as otherwise acceptable to Lender.

Section 10.3   Principles of Construction.  The following principles of construction shall apply to this Agreement:

(a)     The titles and headings of the Articles, Sections and subsections of this Agreement have been inserted for convenience of reference only and are not intended to summarize or otherwise describe the subject matter of such Articles, Sections and subsections and shall not be given any consideration in the construction of this Agreement.

(b)     All references to Sections and Exhibits are to Sections and Exhibits in or to this Agreement unless otherwise specified. Any reference to "this Section" in this Agreement shall mean the Section in which such reference appears, and shall also be deemed refer to the subsections contained in such Section.

(c)     Unless otherwise specified, the words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(d)     The words "includes", "including" and similar terms shall be construed as if followed by the words "without limitation."

(e)     Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

(f)     To the extent that any provision in this Agreement requires, expressly or implicitly, performance, observance or compliance by any Person other than Borrower, or requires Borrower or any other Loan Party to cause such performance, observance or compliance, such provision shall be construed as Borrower's obligation to cause such other Person to perform, observe or comply with such provision, and, accordingly, the failure by such Person to perform, observe or comply with such provision shall be considered a breach by Borrower of her obligations under this Agreement.  Further, whenever any provision of this Agreement prohibits any Person from doing or causing to be done, or requires any Person to abstain from doing or causing or permitting, any act or thing, such provision shall be deemed to have been breached if such act or thing is done by any Loan Party or other Person acting by or on behalf of such Person.

       (g)     Definitions contained in this Agreement or any other Loan Document which identify documents, including this Agreement or any other Loan Document, shall be deemed to include all Amendments thereto.

       (h)     Any reference in the Loan Documents to the successors or assigns of any Loan Party shall not be construed to imply any consent or approval by Lender of any such succession or assignment.

       (i)     Borrower acknowledges and agrees that this Agreement and the other Loan Documents shall not be construed more strictly against the Lender because the Lender or its legal counsel was the primary draftsperson of this Agreement or such other Loan Document, as the case may be.

    Section 10.4   <u>Parties Bound, Etc</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective permitted successors and assigns, provided nothing in this Section shall be deemed to give Borrower or any other Loan Party the right to transfer any interest in the Property or transfer any Ownership Interest except as is expressly permitted hereunder.

    Section 10.5   <u>Waivers</u>.  Lender may at any time and from time to time waive any one or more of the conditions, requirements or obligations contained herein, but any such waiver shall be deemed to be made in pursuance hereof and not in modification thereof, and any such waiver in any instance or under any particular circumstance shall not be effective unless in writing and shall not be considered a waiver of such condition in any other instance or any other circumstance.

    Section 10.6   <u>Severability</u>.  If any term, covenant or provision of this Agreement or any other Loan Document shall be held to be invalid, illegal or unenforceable in any respect, this remainder of this Agreement or such other Loan Document shall remain in full force and effect and shall be construed without such term, covenant or provision.

    Section 10.7   <u>Release of Collateral</u>.  Lender may release, regardless of consideration, any part of the Collateral without in any way impairing or affecting the validity, priority or perfection of its Lien on or in the remaining Collateral.

    Section 10.8   <u>Notices</u>. Any notice, demand or other communication required or permitted hereunder shall be in writing and shall be deemed to have been given if and when personally delivered, or on the second business day after being deposited in United States registered or certified mail, postage prepaid, and addressed to a party at its address set forth below or to such other address the party to receive such notice may have designated to all other parties by notice in accordance herewith:

      If to Lender:          NATIONAL CITY BANK OF MICHIGAN/ILLINOIS
                          One North Franklin Street, Suite 3600
                          Chicago, Illinois 60606
                          ATTN: LAURA AUWERDA, SENIOR VICE PRESIDENT

| with a copy to: | ROBBINS, SALOMON & PATT, LTD.<br>25 East Washington Street, Suite 1000<br>Chicago, Illinois 60602<br>ATTN: ANDREW M. SACHS, ESQ. |
| --- | --- |
| If to Borrower: | SHARON SKLAROV<br>221 South Ridge Road<br>Lake Forest, Illinois 60007 |
| with a copy to: | DONALD LAVIN, ESQ.<br>95 Revere Drive, Suite J<br>Northbrook, Illinois 60062 |

or to such other address the party to receive such notice may have heretofore furnished to all other parties by notice in accordance herewith. Except as otherwise specifically required herein, no notice of the exercise of any right or option granted to Lender herein is required to be given.

Section 10.9  Modification. This Agreement may not be modified, amended or terminated, except by an agreement in writing executed by Lender and Borrower. Borrower acknowledges that the Loan Documents set forth the entire agreement and understanding of Lender and the Loan Parties with respect to the Loans and that no oral or other agreements, understandings, representations or warranties exist with respect to the Loans other than those expressly set forth in the Loan Documents. All prior agreements among or between such parties, whether oral or written, are superceded by the terms of the Loan Documents.

Section 10.10  Indemnity. Borrower hereby agrees to defend, indemnify and hold harmless Lender, its directors, officers, employees, agents, successors and assigns (each an "**Indemnified Lender Party**") from and against any and all losses, damages, liabilities, claims, actions, judgments, court costs and legal or other expenses (including attorneys' fees) which such Indemnified Lender Party may incur as a direct or indirect consequence of: (i) the use of the Property or any portion thereof; (ii) the compliance of the Property and each portion thereof with Applicable Law, (iii) the purpose to which Borrower or any other Loan Party applies the proceeds of the Loans; (iv) the failure of Borrower to perform, or to cause any Loan Party to perform, any obligations as and when required by any of the Loan Documents; (v) any failure at any time of Borrower's or any other Loan Party's representations or warranties to be true and correct; or (vi) any act or omission by Borrower or any other Loan Party or other Person (other than Lender) with respect to the Property or any portion thereof. Borrower shall pay to such Indemnified Lender Party, within ten (10) days of such Indemnified Lender Party's demand therefore, any amounts owing under this indemnity. To the extent that any Indemnified Lender Party has made any payment on account of any matter for which it is indemnified hereunder which is not repaid within such time, Lender shall be deemed to have made a Protective Advance in the amount so owing to such Indemnified Lender Party. Borrower's duty and obligation to defend, indemnify and hold harmless each Indemnified Lender Party shall survive cancellation of the Notes, repayment of the Debt and the release or reassignment of any Collateral. Notwithstanding anything in this Agreement to the contrary, no Indemnified Lender Party shall be entitled to be indemnified for its own gross negligence or willful misconduct.

Section 10.11 <u>Lender Consent and Approval.</u>   Except as may otherwise be expressly provided to the contrary, wherever pursuant to this Agreement or any other Loan Document or otherwise with respect to the Loans, Lender exercises any right given to it to consent or not consent, or to approve or disapprove, or any arrangement or term is to be satisfactory to Lender or Lender is otherwise entitled to exercise its judgment or discretion, the decision of Lender to consent or not consent, or to approve or disapprove or to decide that arrangements or terms are satisfactory or not satisfactory or otherwise to exercise its judgment or discretion, shall be in the sole and absolute discretion of Lender and shall be final and conclusive.

Section 10.12   <u>Reasonableness.</u>   If at any time Borrower believes that Lender has not acted reasonably in granting or withholding any approval or consent under the Loan Documents or any other document or instrument now or hereafter executed and delivered in connection therewith or otherwise with respect to the Loans, as to which approval or consent either Lender has expressly agreed to act reasonably, or absent such agreement, a court of law having jurisdiction over the subject matter would require Lender to act reasonably, then as the sole and exclusive remedy of Borrower and each Loan Party, Borrower or such Loan Party shall be entitled to seek injunctive relief or specific performance. Further, Borrower hereby covenants and agrees that no action or claim for monetary damages, consequential damages or punitive damages or any other damages (including lost profit) shall in any event or under any circumstance be maintained by Borrower or any other Loan Party against Lender, and Borrower hereby waives any right to any such damages.

Section 10.13   <u>Relationship.</u> The relationship of Lender, and the one hand, and Borrower and each other Loan Party, on the other hand, is strictly and solely that of lender and borrower and nothing contained in the Loan Documents or any other document or instrument now or hereafter executed and delivered in connection therewith or otherwise in connection with the Loans is intended to create, or shall in any event or under any circumstance be construed as creating, a partnership, joint venture, tenancy-in-common, joint tenancy or other relationship of any nature whatsoever between Lender, one the one hand, and Borrower and/or any other Loan Party, on the other hand, other than as lender and borrower. Lender neither undertakes nor assumes any responsibility or duty to Borrower or any other Loan Party, except as expressly provided in this Agreement and the other Loan Documents, or to any other Person.

Section 10.14   <u>Brokers and Financial Advisors.</u> Borrower hereby represents to Lender that no Loan Party or any Affiliate thereof has dealt with financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement. Borrower agrees to indemnify and hold the Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind in any way (including reasonable attorneys' fees) relating to or arising from a claim by any Person that such Person acted on behalf of any Loan Party or any Affiliate thereof in connection with the transactions contemplated herein. The provisions of this Section shall survive the expiration and termination of this Agreement and the repayment of the Debt.

Section 10.15   <u>Counterclaims.</u> Borrower hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with the Loans or the Loan Documents.

Section 10.16    Loan Expenses. Borrower covenants and agrees to immediately pay Lender on demand all costs and expenses ("**Loan Expenses**") including reasonable attorneys' fees, incurred by Lender in connection with or relating to the Loans, including: (i) Lender's Closing Expenses; (ii) the Loan Parties' ongoing performance of and compliance with their respective agreements and covenants contained in the Loan Documents on their part to be performed or complied with after the Closing Date, including confirming compliance with environmental and insurance requirements; (iii) any request made to Lender for consent or approval of any matter; (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers, extensions or other modifications to the Loan Documents or any other document or matter requested by any Loan Party, by Lender; (v) all federal, state, county and local taxes, filing, registration or recording fees and all other taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of any of Loan Documents; (vi) title insurance premiums and escrow charges; and (vii) reasonable attorneys' fees incurred by Lender in connection with any of the foregoing, including in connection with any bankruptcy or similar proceeding affect the Property, the Collateral or any Loan Party. All Loan Expenses incurred by Lender shall be due and payable within ten (10) days of demand, and (without limiting any other right or remedy of Lender) if not paid within such 10-day period shall bear interest at the Default Rate from the date of such demand until the date paid.

Section 10.17    Protective Advances.

(a)    Protective Advances. Borrower covenants and agrees to immediately pay Lender on demand all costs and expenses, including reasonable attorneys' fees, incurred by Lender in connection with or as a consequence of any of the following (each a "**Protective Advance**"): (i) any Unmatured Default or Event of Default under the Loan Documents including any costs and expenses and other amounts expended by Lender in curing or attempting to cure the same; (ii) any bankruptcy proceeding of any Loan Party; (iii) the collection of the Debt, (iv) the enforcement of Lender's rights and remedies under the Loan Documents or enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting the Property, any Loan Party, the Loan Documents, or any Collateral; or (v) any payment or other amount which is designated as a Protective Advance by any other provision of the Loan Documents. All Protective Advances made by Lender under the Loan Documents shall be evidenced by, and be deemed to be advanced as principal under, the Notes, regardless of whether any such Protective Advance causes the principal balance of the Notes to exceed the original stated amount of the Notes, and shall be due and payable on demand. Borrower expressly acknowledges that Lender is authorized to make Protective Advances regardless of whether Lender shall have commenced any action or proceeding against Borrower or any other Loan Party subject to **Section 10.17(b)**, the making of any Protective Advance by Lender shall constitute an automatic Event of Default hereunder (with no notice, cure or grace period).

(b)    With respect to any event or circumstance which is a breach, default or violation under one or more Loan Documents, if Lender makes a Protective Advance to cure such default, breach or violation prior to the expiration of any Applicable Grace Period, the making of such Protective Advance shall not constitute an Event of Default hereunder if

prior to the expiration of such Applicable Grace Period Borrower repays to Lender the amount of such Protective Advance together with interest thereon at the Default Rate from the date such Protective Advance was made to the date repaid to Lender.

Section 10.18 <u>Attorneys' Fees</u>. Borrower will pay Lender's reasonable attorneys' fees and costs in connection with the enforcement of this Agreement; without limiting the generality of the foregoing, if at any time or times hereafter the Lender employs counsel for advice or other representation with respect to any matter concerning Borrower, this Agreement, the Property or the Loan Documents or to protect, collect, lease, sell, take possession of, or liquidate the Property, or to attempt to enforce or protect any security interest or lien or other right in the Property or under any of the Loan Documents, or to enforce any rights of the Lender or obligations of Borrower or any other person, firm or corporation which may be obligated to Lender by virtue of this Agreement or under any of the Loan Documents or any other agreement, instrument or document, heretofore or hereafter delivered to Lender in furtherance hereof, then in any such event all of the reasonable attorneys' fees arising from such services, and any expenses, costs and charges relating thereto, shall constitute an additional indebtedness owing by Borrower to Lender payable on demand and evidenced and secured by the Loan Documents.

Section 10.19 <u>Rescission of Payments</u>. If at any time all or any part of any payment made by Borrower or any other Loan Party in connection with this Agreement or any other Loan Document is rescinded, returned or Lender is otherwise required to hold such payment in trust for or otherwise return the payment to another Person, for any reason whatsoever (including the insolvency, bankruptcy or reorganization of any Loan Party or any other Person), then the Obligations of Borrower or such other Loan Party shall, to the extent of the payment rescinded or returned, be deemed to have continued in existence notwithstanding such previous payment, and the Obligations of Borrower or such Loan Party under the Loan Documents shall continue to be effective or be reinstated, as the case may be, as to such payment, all as though such previous payment had never been made.

Section 10.20 <u>No Third Party Beneficiary</u>. No Person other than Lender and Borrower and their permitted successors and assigns or any Indemnified Lender Party shall have any rights under this Agreement.

Section 10.21 <u>Counterparts</u>. To facilitate execution, this Agreement may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all Persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single document. It shall not be necessary in making proof of this Agreement to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart.

Section 10.22 <u>Facsimile and Photocopy</u>. Lender and Borrower hereby agree that any facsimile or photocopy signature on any Loan Document or on any notice, document or other certificate delivered pursuant to the Loan Documents shall be deemed to have the same force and effect as an original signature, and to the fullest extent permitted by Applicable Law may be used

in lieu of an original signature to evidence the execution and delivery of the document, certificate or instrument to which such facsimile or photocopy signature is attached.

Section 10.23 <u>Time</u>. Time is of the essence of each and every term of this Agreement and the other Loan Documents, except and only to the extent specifically waived by Lender in writing.

Section 10.24 <u>WAIVER OF STATUTORY RIGHTS</u>. BORROWER SHALL NOT APPLY FOR OR AVAIL HERSELF OF ANY APPRAISEMENT, VALUATION, STAY, EXTENSION OR EXEMPTION LAWS, OR ANY SIMILAR LAWS NOW EXISTING OR HEREAFTER ENACTED, IN ORDER TO PREVENT OR HINDER THE ENFORCEMENT OF THE LOAN DOCUMENTS, BUT HEREBY WAIVES THE BENEFIT OF SUCH LAWS TO THE FULL EXTENT THAT SHE MAY DO SO UNDER APPLICABLE LAW. BORROWER HEREBY WAIVES ANY AND ALL RIGHT TO HAVE THE PROPERTY AND ESTATES COMPRISING THE COLLATERAL MARSHALED AND AGREES THAT ANY COURT HAVING JURISDICTION OVER ANY EXERCISE OF LENDER'S REMEDIES MAY ORDER THE COLLATERAL SOLD AS AN ENTIRETY OR IN SEPARATE PARTS. BORROWER HEREBY WAIVES, TO THE FULL EXTENT SHE MAY DO SO OR NOT PROHIBITED UNDER APPLICABLE LAW, ANY AND ALL RIGHTS OF REDEMPTION FROM SALE UNDER ANY ORDER OR DECREE OF FORECLOSURE, UCC AUCTION OR UNDER ANY PUBLIC OR PRIVATE SALE PERMITTED UNDER ANY APPLICABLE LAW NOW EXISTING OR HEREAFTER ENACTED.

Section 10.25 <u>USURY LAWS</u>.

(a)     BORROWER ACKNOWLEDGES AND AGREES THAT ALL AMOUNTS PAYABLE UNDER THE LOAN DOCUMENTS FORM AN INTEGRAL COMPONENT OF THE DEBT AND PAYMENT OF THE SAME IS A MATERIAL INDUCEMENT TO LENDER TO MAKE THE LOANS AND ENTER INTO THE LOAN DOCUMENTS, AND THAT LENDER WOULD NOT BE WILLING TO MAKE THE LOANS AND ENTER INTO THE LOAN DOCUMENTS BUT FOR BORROWER'S AGREEMENT TO PAY THE ENTIRE DEBT PURSUANT TO THE TERMS OF THE LOAN DOCUMENTS. BORROWER FURTHER ACKNOWLEDGES AND AGREES THAT THE PAYMENT OF THE ENTIRE DEBT IS FAIR AND REASONABLE IN LIGHT OF THE SIZE OF THE RISK TAKEN BY LENDER AND THAT PAYMENT OF THE ENTIRE DEBT OR ANY COMPONENT THEREOF WILL NOT VIOLATE APPLICABLE USURY LAWS. WITHOUT LIMITING THE FOREGOING, BORROWER HEREBY WAIVES ANY RIGHT OR DEFENSE SHE MAY HAVE TO THE PAYMENT OF THE DEBT OR ANY PORTION THEREOF BASED ON ANY USURY, PENALTY OR OTHER SIMILAR LAWS OR EQUITABLE PRINCIPLES.

(b)     BORROWER ACKNOWLEDGES AND AGREES, WITHOUT LIMITING THE ABOVE, THIS AGREEMENT AND EACH OF THE OTHER LOAN DOCUMENTS IS SUBJECT TO THE EXPRESS CONDITION THAT AT NO TIME SHALL BORROWER OR ANY OTHER LOAN PARTY BE OBLIGATED OR REQUIRED TO PAY ANY AMOUNT UNDER THE LOAN DOCUMENTS INCLUDING ANY INTEREST ON THE PRINCIPAL BALANCE OF THE LOANS AT A RATE IN EXCESS

OF THE MAXIMUM INTEREST RATE WHICH BORROWER OR SUCH LOAN PARTY IS PERMITTED BY APPLICABLE LAW TO CONTRACT OR AGREE TO PAY. IN DETERMINING WHETHER OR NOT THE INTEREST OR ANY OTHER AMOUNT PAID OR PAYABLE UNDER THE LOAN DOCUMENTS EXCEEDS THE MAXIMUM RATE PERMITTED UNDER APPLICABLE LAW (A) BORROWER OR SUCH LOAN PARTY AND LENDER SHALL TO THE EXTENT PERMITTED UNDER APPLICABLE LAW CHARACTERIZE ANY NON-PRINCIPAL PAYMENT, AS A FEE, PREMIUM OR EXPENSE RATHER THAN INTEREST, AND (B) ALL SUMS PAID OR AGREED TO BE PAID TO LENDER FOR THE USE, FORBEARANCE, OR DETENTION OF THE DEBT, SHALL, TO THE EXTENT PERMITTED BY APPLICABLE LAW, BE AMORTIZED, PRORATED, ALLOCATED, AND SPREAD THROUGHOUT THE FULL STATED TERM OF THE LOAN UNTIL PAYMENT IN FULL SO THAT THE RATE OR AMOUNT OF INTEREST ON ACCOUNT OF THE DEBT DOES NOT EXCEED THE MAXIMUM LAWFUL RATE OF INTEREST. IF BY THE TERMS OF THE LOANS DOCUMENTS, BORROWER OR SUCH LOAN PARTY IS AT ANY TIME REQUIRED OR OBLIGATED TO PAY ANY AMOUNT UNDER THE LOAN DOCUMENTS INCLUDING INTEREST ON THE PRINCIPAL BALANCE DUE UNDER THE LOANS AT A RATE IN EXCESS OF SUCH MAXIMUM RATE, SUCH INTEREST SHALL BE DEEMED TO BE IMMEDIATELY REDUCED TO SUCH MAXIMUM RATE AND ALL PREVIOUS PAYMENTS IN EXCESS OF THE MAXIMUM RATE SHALL BE DEEMED TO HAVE BEEN PARTIAL PREPAYMENTS (WHETHER OR NOT PERMITTED OR PROHIBITED UNDER THE LOAN DOCUMENTS) IN REDUCTION OF PRINCIPAL AND NOT ON ACCOUNT OF THE INTEREST DUE.

Section 10.26 GOVERNING LAW. THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF ILLINOIS, AND THE LOANS WILL BE MADE BY LENDER IN THE STATE OF ILLINOIS, AND THE PROCEEDS OF THE LOANS DELIVERED PURSUANT HERETO WILL BE DISBURSED FROM THE STATE OF ILLINOIS, WHICH STATE THE LENDER AND BORROWER AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF ILLINOIS APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (EXCLUDING APPLICATION OF ANY PRINCIPLE OF CONFLICT OF LAWS WHICH WOULD DIRECT THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW OR NOT PROHIBITED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, AND THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS.

Section 10.27 <u>JURISDICTION</u>.

(a)    <u>SUIT BY BORROWER OR LOAN PARTY</u>. BORROWER HEREBY AGREES THAT ANY LEGAL SUIT, ACTION OR PROCEEDING BROUGHT BY BORROWER AND/OR ANY LOAN PARTY OR ANY AFFILIATE THEREOF AGAINST LENDER (OTHER THAN COMPULSORY COUNTERCLAIMS PERMITTED HEREUNDER IN CONNECTION WITH ANY ACTION, SUIT OR PRECEDING COMMENCED BY LENDER IN A JURISDICTION OUTSIDE OF ILLINOIS) ARISING OUT OF OR RELATING TO THE LOANS, THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR RELATING TO THE PROPERTY SHALL ONLY BE INSTITUTED BY BORROWER OR SUCH OTHER LOAN PARTY OR ANY AFFILIATE THEREOF IN COURTS OF THE STATE OF ILLINOIS LOCATED IN THE COUNTY OF COOK, STATE OF ILLINOIS OR THE UNITED STATES DISTRICT COURT LOCATED IN THE CITY OF CHICAGO, ILLINOIS. BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO BRING ANY LEGAL OR EQUITABLE SUIT, ACTION OR PROCEEDING AGAINST LENDER ARISING OUT OF OR RELATING TO THE LOANS, THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR RELATING TO THE PROPERTY IN ANY OTHER COURT OTHER THAN COURTS OF THE STATE OF ILLINOIS LOCATED IN THE COUNTY OF COOK OR THE UNITED STATES DISTRICT COURT LOCATED IN THE CITY OF CHICAGO, ILLINOIS.

(b)    <u>SUIT BY LENDER</u>. WITH RESPECT TO ANY CLAIM OR ACTION ARISING HEREUNDER OR UNDER THE OTHER LOAN DOCUMENTS, BORROWER (I) IRREVOCABLY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF ILLINOIS AND THE UNITED STATES DISTRICT COURT LOCATED IN THE CITY OF CHICAGO, ILLINOIS, (II) AGREES THAT ALL SUCH CLAIMS OR ACTIONS MAY, IN LENDER'S DISCRETION, BE HEARD AND DETERMINED IN SUCH COURTS OF THE STATE OF ILLINOIS OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT AND (III) IRREVOCABLY WAIVES ANY (A) OBJECTION WHICH SHE MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT BROUGHT IN ANY SUCH COURT AND (B) ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. NOTHING IN THIS AGREEMENT WILL BE DEEMED TO PRECLUDE LENDER FROM BRINGING AN ACTION OR PROCEEDING WITH RESPECT HERETO IN ANY OTHER JURISDICTION.

(c)    <u>AGENT FOR PROCESS</u>. BORROWER WILL MAINTAIN AN AGENT FOR SERVICE OF PROCESS IN LAKE FOREST, ILLINOIS AND GIVE PROMPT NOTICE TO LENDER OF THE ADDRESS OF THE NAME AND ADDRESS OF ANY NEW AGENT APPOINTED BY BORROWER. BORROWER FURTHER AGREES THAT THE FAILURE OF HER AGENT FOR SERVICE OF PROCESS TO GIVE HER NOTICE OF ANY SERVICE OF PROCESS WILL NOT IMPAIR OR AFFECT THE VALIDITY OF SUCH SERVICE OR OF ANY JUDGMENT BASED THEREON. IN

ADDITION, BORROWER IRREVOCABLY CONSENTS TO SERVICE OF PROCESS BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO HER AT HER ADDRESS GIVEN OR REFERRED TO IN **SECTION 10.8** OF THIS AGREEMENT.

Section 10.28 <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>. BORROWER HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY FOR ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THE LOAN DOCUMENTS OR (B) IN ANY WAY RELATING TO THE PROPERTY, THE LOANS, THE LOAN DOCUMENTS OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION IS NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND BORROWER AND LENDER HEREBY AGREE AND CONSENT THAT LENDER MAY FILE AN ORIGINAL COUNTERPART OF THIS AGREEMENT OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF BORROWER TO THE WAIVER OF ANY RIGHT BORROWER MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

[signatures on the following page]

IN WITNESS WHEREOF, Lender and Borrower have duly executed this Agreement the day and year first above written.

_____

**SHARON SKLAROV**


**N A T I O N A L   C I T Y   B A N K   O F MICHIGAN/ILLINOIS**

By: _____

Print Name: _R. Michael Dunn_

Its: _Senior Vice President_

EXHIBIT A

(Definition of Certain Terms)

"Advance" means any disbursement made by Lender for any purpose pursuant to the Loan Documents including, without limitation, any disbursement of the Term Loan and the Line of Credit Loan.

"Affiliate" of any specified Person means (i) any other Person controlling, controlled by or under common control with such specified Person; (ii) any immediate or extended family member of such Person; and (iii) any other Person controlling, controlled by or under common control with such family member. In addition, each Loan Party or other Person holding any Ownership Interest shall be deemed an Affiliate of (i) each other Loan Party or other Person holding any Ownership Interest and (ii) each other Person controlling, controlled by or under common control with such other Loan Party or other Person holding any Ownership Interest. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise; and "controlling" and "controlled" have meanings correlative to the foregoing.

"Agreement" means this Loan Agreement, as the same may from time to time be amended.

"Amendments" means any and all amendments, modifications, extensions, replacements, terminations, renewals, substitutions, consolidations, restatements, or supplements made from time to time.

"Applicable Grace Period" means a period of time, if any, with respect to any event or circumstance which is a breach, default or violation under one or more Loan Documents for which a notice, grace or cure period is given under such Loan Document(s), the period (A) commencing on the date such event or circumstance first occurred and (B) ending on the date such notice, grace or cure period would have expired had no cure been effected.

"Applicable Law" means (i) all existing and future governmental statutes, laws, rules, orders, regulations, ordinances, judgment decrees and injunctions of any Governmental Authority (including Environmental Laws) affecting either the Lender, any Loan Party, the Property, any Collateral, or any part thereof (whether now or hereafter enacted and in force), including those relating to zoning, occupancy, building codes, health, fire and safety; (ii) all permits, licenses and authorizations and regulations relating thereto, including the building permit and certificates of occupancy; and (iii) all covenants, conditions and restrictions contained in any agreements, instruments or other documents at any time in force (whether or not involving any Governmental Authority) affecting the Property or any part thereof.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978 (11 U.S.C. § 101-1330) as now or hereafter amended or recodified.

"Bankruptcy Law" means the Bankruptcy Code and any other existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship or similar law, rule or regulation for the relief of debtors.

"Borrower" has the meaning set forth in the introductory paragraph of this Agreement.

"Borrower's and Guarantor's Counsel Opinions" means the opinions of legal counsel in form and content satisfactory to Lender covering such matters as Lender shall reasonably request, including: (a) organization, legal existence, good standing and qualification of each Loan Party in each applicable jurisdiction, (b) organizational power and authority of each Loan Party; (c) the due execution and delivery of each of the Loan Documents and the enforceability of each of the Loan Documents under Illinois law and, as applicable, Missouri law; (d) absence of conflicts with organizational documents and Applicable Law; (e) litigation; (f) no further consents required; (h) perfection of Liens; (i) usury and (j) choice of law.

"Borrower Estoppel Certificates" has the meaning set forth in **Section 10.2** of this Agreement.

"Borrower's Knowledge" means the actual knowledge of any Loan Party.

"Business Day" means any day other than (i) a Saturday or a Sunday and (ii) a day on which federally insured depository institutions in the State of Illinois are authorized or obligated by applicable law to be closed.

"Casualty" means any loss, damage or destruction of the Property or any portion thereof by fire, casualty, act of god or otherwise.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, and any other amendments thereto now or hereafter enacted.

"Closing Date" means November 26, 2003.

"Code" means the Internal Revenue Code of 1986, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Collateral" means any and all property, real or personal, tangible or intangible, described in the Loan Documents as being mortgaged, assigned, pledged or transferred to Lender by any Loan Party as security for the Obligations.

"Condemnation" means any taking of the Property or any portion thereof by any Condemning Authority through eminent domain or otherwise, including any transfer made in lieu of or in anticipation of the exercise of such taking.

"Condemning Authority" means any Person who has condemnation or eminent domain powers over the Property or any portion thereof.

"Contractor Party" means a contractor, material provider or service provider pursuant to any agreement with Borrower for any portion of the Improvements.

"Debt" means the following: (a) all sums due and payable under the Loan Documents, including the whole of the principal sum of the Notes and all accrued and unpaid interest thereon, together with any and all other sums due under the Notes, additional fees and costs, all as may be set forth with greater specificity in the applicable terms and provisions of the Notes or the other Loan Documents, (b) all Protective Advances, (c) all Loan Expenses, (d) all other monies or amounts agreed or provided to be paid by Borrower under the Loan Documents, and (e) all other sums advanced and costs and expenses (including reasonable attorneys' fees) incurred by Lender in connection with the foregoing indebtedness or any part thereof, any renewal, extension, or change of or substitution for the foregoing indebtedness or any part thereof.

"Debt Service" means, for any period, the sum of (i) all interest charges incurred by Borrower for such period using the interest rate equal to the greater of (x) two and one-half percent (2½%) above the rate of interest equal to the yield of the most actively traded issues of ten (10) year U.S. Treasury Bills or (y) eight percent (8.00%) or (z) the current actual interest rate for the Notes and (ii) all principal payments that would be due and payable from Borrower to Lender during such period assuming a twenty-five (25) year "Mortgage Style" amortization of the remaining principal balance of the Loans.

"Debt Service Coverage Ratio" means, for any period, the ratio of Borrower's Net Operating Income to Borrower's Debt Service.

"Deed of Trust" has the meaning set forth in **Section 2.1** of this Agreement.

"Default Rate" has the meaning set forth in **Section 1.5(c)** of this Agreement.

"Easement Areas" means real property which (a) directly abuts the Property and (b) directly abuts a public right-of-way, which real property is the subject of an easement (whether or not recorded) agreement which benefits the Property, all of which Easement Areas are listed in Schedule A of the Lender's Title Insurance Policy so as to be included in the "insured property" description.

"Environmental Indemnity" has the meaning set forth in **Section 2.1** of this Agreement.

"Environmental Laws" means any and all present and future laws, statutes, ordinances, rules, regulations, orders, and determinations of any Governmental Authority, pertaining to health, Hazardous Materials, natural resources, conservation, wildlife, pollution or the environment, including CERCLA.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, or any successor statute.

69042902
11/20/03

A-3

"ERISA Affiliate" means each person (as defined in Section 3(9) of ERISA) which together with Borrower or any Subsidiary (as defined under ERISA) thereof, would be deemed to be a member of the same "controlled group" within the meaning of Section 414(b), (c), (n) and (o) of the Code.

"Event of Default" has the meaning set forth in **Section 9.1** of this Agreement.

"Financing Statements" means the UCC financing statements covering any Collateral as Lender may require from time to time.

"Governmental Authority" means the United States of America, any state thereof, any political subdivision of the United States of America or any state (including any city or county in such states), and any department, commission, agency, board, bureau, court or administrative, regulatory, adjudicatory, or arbitrational body or other instrumentality or agency of any kind or any of them having jurisdiction in any way over the Property, any Loan Party, or any other Person referred to in this Agreement.

"Gross Revenues" means for any period, revenues determined in accordance with generally accepted accounting principles consistently applied, derived from the ownership, operation, use, leasing and occupancy of the Property during such period, as set forth in the most recent certified aggregate rent roll for the Property provided by Borrower to Lender, together with all necessary supporting documentation reasonably requested by Lender; provided, however, that in no event shall Gross Revenues include (i) any gain arising from any write-up of assets; (ii) any proceeds of the Loans; (iii) proceeds or payments under insurance policies; (iv) gross receipts of licensees, concessionaires or similar third parties, except that portion paid to Borrower, if any; (v) condemnation proceeds or sales proceeds in lieu of and/or under threat of condemnation; (vi) any security deposits received from tenants in the Property, unless and until the same are applied to rent or other obligations in accordance with the tenant's lease; or (vii) any other extraordinary items, in Lender's reasonable discretion.

"Guaranty" has the meaning set forth in **Section 2.1** of the Agreement.

"Guarantor" means Vladimir Sklarov.

"Hazardous Material" means any substance that is defined or listed as a hazardous, toxic or dangerous substance under any present or future Environmental Law or that is otherwise regulated or prohibited or subject to investigation or remediation under any present or future Environmental Law because of its hazardous, toxic, or dangerous properties, including (i) any substance that is a "hazardous substance" under CERCLA, and (ii) asbestos, petroleum, petroleum products and polychlorinated byphenyls.

"Improvements" means certain tenant improvements, asbestos removal and other general cosmetic improvements at the Property.

"Indebtedness" means, as applied to any Person, all of the obligations, liabilities and indebtedness of such Person, secured or unsecured, contingent or otherwise, "recourse" or "non-

recourse," including the following: (a) all debt and similar monetary obligations; (b) all liabilities secured by a Lien, whether or not any liability secured thereby shall have been assumed by another Person; (c) all obligations arising under capital leases; (d) all guarantees, endorsements and other contingent obligations for borrowed money, whether direct or indirect, in respect of Indebtedness of others; (e) any agreement or obligation to reimburse, indemnify, defend or hold harmless any Person under any circumstance; (f) the acquisition cost of any asset to the extent payable before or after the time of acquisition or possession by the party liable where the advance or deferred payment is arranged primarily as a method of raising capital or financing the acquisition of that asset; (g) all obligations to reimburse any issuer in respect of any letter of credit; and (h) all operating expenses and trade payables.

"Late Charges" has the meaning set forth in the Notes.

"Leases" means any lease, license, occupancy agreement or other agreement (whether written or oral), existing as of the Closing Date or hereafter entered into by or on behalf of Borrower, pursuant to which any person or entity is granted a possessory interest in or right to use or occupy all or any portion of any space in the Property, and every modification, amendment or other agreement relating to such lease or other agreement entered into in connection with such lease.

"Lender" has the meaning set forth in the introductory paragraph of this Agreement.

"Lender's Closing Expenses" means all out-of-pocket fees, costs and expenses and disbursements of Lender including all reasonable attorneys' fees incurred by Lender, in connection with (i) the negotiation, preparation, execution and delivery of the Loan Documents, (ii) the creation, perfection or protection of Lender's Liens in the Collateral (including fees and expenses for title and lien searches and filing and recording fees, intangible taxes, personal property taxes, due diligence expenses, travel expenses, costs of appraisals, environmental reports, surveys and engineering reports) and (iii) due diligence and review, including title, survey, and all other matters related to making the Loans.

"Lender's Title Insurance Policy" means, with respect to the Property, an ALTA extended coverage loan title insurance policy (1970 unmodified form, where issuable) (a) issued by the Title Company, which policy shall name Lender as the insured party, (b) insuring Lender's Deed of Trust on the Property, (c) showing no encumbrances against the Property other than Permitted Exceptions, (d) in an aggregate amount equal to the Loans and (e) otherwise in form and content satisfactory to Lender, in Lender's sole and absolute discretion. The Lender's Title Insurance Policy shall include the following endorsements or affirmative coverages in form and substance satisfactory to Lender; Lender's Comprehensive; Zoning 3.1; Tax Parcel; Contiguity; Access; Same As Survey; Creditor's Rights; and such other endorsements as Lender shall determine to be prudent and commercially reasonable to provide insurance against specific risks identified by Lender in connection with the Property.

"Lien" means any mortgage, deed of trust, lien (statutory or other), pledge, hypothecation, assignment, preference, priority, security interest, or any other encumbrance or charge (including any conditional sale or other title retention agreement, any sale-leaseback, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement

or similar instrument under the applicable Uniform Commercial Code or comparable law of any other jurisdiction, domestic or foreign, and mechanics', materialmen's and other similar liens and encumbrances).

"Line of Credit Note" has the meaning set forth in **Section 2.1(c)** of this Agreement.

"Line of Credit Loan" has the meaning provided in **Paragraph B** of the Recitals of this Agreement.

"Loans" has the meaning provided in **Paragraph C** of the Recitals of this Agreement.

"Loan Closing Conditions" has the meaning set forth in **Section 4.1** of this Agreement.

"Loan Commitment Fees" has the meaning set forth in **Section 1.12** of this Agreement.

"Loan Documents" means the documents set forth in **Section 2.1** of this Agreement and any and all other documents, instruments and agreements now existing or hereafter entered into, evidencing, securing or otherwise relating to the Loans, together with any Amendments to such Loan Documents.

"Loan Expenses" has the meaning set forth in **Section 10.16** of this Agreement.

"Loan Opening Date" means the date on which the first Advance of all or any portion of the Line of Credit Loan is made by Lender to Borrower.

"Loan Party" means Borrower and Guarantor.

"Material Adverse Change" means, individually or in the aggregate, the occurrence of any event or the failure of any event to occur which has resulted in a material adverse change (in comparison to any state of affairs existing before or after the Closing Date) to (i) the business operations, assets or condition (financial or otherwise) of any Loan Party, (ii) the ability of any Loan Party to perform, or of Lender to enforce, any material provision of the Loan Documents or (iii) the value or use of the Property or the operation thereof.

"Maturity Date" means the first to occur of (i) November 26, 2006 or (ii) the date on which the Debt becomes due and payable pursuant to the provisions of the Loan Documents (whether by acceleration or otherwise).

"Net Operating Income" means for any period, the amount by which Gross Revenues attributable to the Property for such period exceeds Operating Expenses attributable to the Property for such period.

"Notes" has the meaning set forth in **Section 2.1** of this Agreement.

"Obligations" has the meaning set forth in **Section 2.2** of this Agreement.

69042902
11/20/03                                    A-6

"One Month LIBOR Rate" means the rate per annum (rounded upwards, if necessary, to the next higher one sixteenth (1/16th) of one percent (1%)) determined by Lender and equal to the average rate per annum at which deposits (denominated in United States dollars) in an amount similar to the principal amount of that Term Loan and with a maturity one month after the date of reference are offered at 11:00 a.m. London time (or as soon thereafter as practicable) on the date of reference by banking institutions in the London, United Kingdom market, as such interest rate is referenced and reported by the British Bankers Association in Bridge Financial Telerate System "Page 3,750" report or, if the same is unavailable, any other generally accepted authoritative source of such interest rate as Lender may reference from time to time. The foregoing is not necessarily (i) the lowest rate of interest or the only "LIBOR" denominated interest rate then available from Lender on fluctuating rate loans or (ii) determined in the same manner as any other "LIBOR" denominated interest rate offered by Lender. The foregoing is not necessarily determined in the same manner as any other "LIBOR" denominated interest rate offered by any other bank or published by any publication. The One Month LIBOR Rate is subject to change, as necessary, at the end of each Banking Day (defined as any day other than any Saturday, Sunday or legal holiday in which Lender's banking offices are open to the public for carrying then substantially all of its banking functions) during the term hereof.

"Operating Expenses" means for any period, the actual costs and expenses of owning, operating, managing and maintaining the Property during such period incurred by Borrower, determined on a cash basis (except for real and personal property taxes and insurance premiums, which shall be determined on an accrual basis) is verified in a sworn statement of Borrower delivered to Lender together with all necessary supporting documentation reasonably requested by Lender, including, without limitation, required repairs and maintenance, payroll expenses, management fees of at least four percent (4%) of Gross Revenues, real estate taxes, insurance premiums, utility costs and a $.20 per square foot reserve for structural repairs and capital expenditures to the Property; provided, however, that in no event shall Operating Expenses include (i) interest on principal due on the Loans; (ii) any fees paid to Lender in connection with the Loans; (iii) capital expenditures and tenant improvement and leasing commission costs; or (iv) depreciation and amortization and other non-cash items.

"Other Charges" has the meaning set forth in Section 7.6(a) of this Agreement.

"Ownership Interest" means (i) any interest in the Property or (ii) any interest in any Person which has a direct or indirect interest in the Property in each case whether such interest is direct or indirect, contingent or fixed, on any level or tier, of any nature whatsoever, whether in the form of a partnership interest, stock interest, membership interest, equitable interest, beneficial interest, profit interest, loss interest, voting rights, control rights or otherwise.

"Permitted Exceptions" means the exceptions to title acceptable to Lender.

"Person" means any individual, sole proprietorship, corporation, general partnership, limited partnership, limited liability company or partnership, joint venture, association, joint-stock company, bank, trust, land trust, estate, unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof), or any other form of entity.

"Unmatured Default" means an event, condition or circumstance, the occurrence or existence of which shall, upon the giving of notice or the passage of time, or both, constitute an Event of Default.

EXHIBIT B

(Legal Description of the Property)

A PARCEL OF GROUND IN BLOCK 97, OF THE CITY OF ST. LOUIS, MISSOURI; SAID
PARCEL BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE
POINT OF INTERSECTION OF THE SOUTHERN LINE OF WASHINGTON AVENUE, 80
FEET WIDE, WITH THE EASTERN LINE OF BROADWAY, 80 FEET WIDE; THENCE S
74°50'E 135.24 FEET, ALONG THE SOUTHERN LINE OF SAID WASHINGTON AVENUE;
THENCE S 15°14'W 75.00 FEET, ALONG A LINE PARALLEL WITH THE EASTERN LINE OF
SAID BROADWAY; THENCE S 74°50'E 24.32, ALONG A LINE PARALLEL WITH THE
SOUTHERN LINE OF SAID WASHINGTON AVENUE; THENCE S 15°14'W 74.04 FEET,
ALONG A LINE PARALLEL WITH THE EASTERN LINE OF SAID BROADWAY, TO THE
NORTHERN LINE OF ST. CHARLES STREET, 50 FEET WIDE; THENCE N 74°57'W 159.56
FEET, ALONG THE NORTHERN LINE OF ST. CHARLES STREET, TO THE EASTERN LINE
OF SAID BROADWAY; THENCE N 15°14'E 149.35 FEET, ALONG THE EASTERN LINE OF
SAID BROADWAY TO THE POINT OF BEGINNING, ACCORDING TO SURVEY MADE BY
ROY E. LEIMBERG, MO P.L.S. #1381, OF PITZMAN'S CO. OF SURVEYOR AND
ENGINEERS, DATED OCTOBER 16, 2003, ORDER NO. 03-593.

Common address:          500 North Broadway, St. Louis, Missouri

Locator Number:          0097 00 0040 0

EXHIBIT C

(List of Required Items)

(a)    <u>Lender's Title Insurance Policy</u>. The Lender's Title Insurance Policy (or a marked binder thereof in form and substance satisfactory to Lender), together with evidence that the premium in respect of the issuance of such Lender's Title Insurance Policy has been paid in full or will be paid on the Closing Date.

(b)    <u>Recorded Documents</u>. Legible copies of all Permitted Exceptions.

(c)    <u>Title Clearance</u>. GAP Affidavit, ALTA Statement, utility letters and such other certificates and title indemnities in favor of Title Company as shall be required to issue the Lender's Title Insurance Policy.

(d)    <u>The Survey</u>. The Survey.

(e)    <u>UCC Searches</u>. UCC Searches dated not later than thirty (30) days prior to Closing Date.

(f)    <u>Disbursement Statement</u>. Detailed disbursement statement prepared by Lender and signed by Borrower, describing the disbursement of the Loans.

(g)    <u>Closing Instruction Letter</u>. Disbursement instructions or escrow letter, signed by the authorized representative of Borrower, Lender and Title Company, irrevocably instructing Lender to fund the proceeds of the Loans being advanced on the Closing Date in accordance with said instructions.

(h)    <u>Zoning</u>. Evidence of compliance with zoning of the Property on the Closing Date including (i) a copy of the applicable zoning ordinance, zoning map, and any special use, variance, PUD, site plan, or other ordinances specific to the Property, and (ii) copy of any applicable subdivision plat.

(i)    <u>Insurance Policies</u>. The insurance policies or certified copies thereof satisfying the requirements of this Agreement or the Loan Documents, and evidence that the premiums in respect of such insurance policies are fully paid, together with endorsements thereto showing Lender as an additional insured and loss payee as set forth in this Agreement.

(j)    <u>Financial Statements</u>. Financial Statements for the Loan Parties.

(k)    <u>Borrower's and Guarantor's Counsel Opinions</u>. Borrower's and Guarantor's Counsel Opinions.

(m)     Tenant Estoppel Certificates.   Tenant Estoppel Certificates, in the forms attached hereto as Exhibit D, from each tenant at the Property required by Lender, dated no earlier than November 1, 2003.

(n)     Subordination, Non-Disturbance and Attornment Agreements.  Subordination, Non-Disturbance and Attornment Agreement in a form acceptable to Lender, from each tenant at the Property required by Lender.

EXHIBIT D

(Tenant Estoppel Certificate)

_____, 2003

National City Bank of Michigan/Illinois
One North Franklin Street, Suite 3600
Chicago, Illinois 60606

Attn:   Laura L. Auwerda, Senior Vice President

Re:    500 North Broadway, St. Louis, Missouri ("Property")

To Whom It May Concern:

We understand that National City Bank of Michigan/Illinois ("Lender") has made or committed to make a loan ("Loan") to Sharon Sklarov ("Borrower") successor in title to _____ ("Seller"), secured or to be secured by, among other things, (a) a Deed of Trust ("Deed of Trust") on the Property, and (b) an assignment of rents and leases respecting the Property. Furthermore, we understand that, as an ongoing requirement of the Loan, Lender requires this agreement and certification by the undersigned.

The undersigned ("Tenant"), being the tenant under the Lease referred to in paragraph 1 below, covering certain premises ("Leased Premises") at the Property hereby certifies to Lender that the following statements are true, correct and complete as of the date hereof:

    1.    Tenant is the tenant under a Lease with Seller or Seller's predecessor in title ("Landlord") dated _____, ____, demising to Tenant _____ square feet at the Property.   The initial term of the Lease shall commence or commenced on _____, and will expire on _____, exclusive of unexercised renewal options and extension options contained in the Lease.  There have been no amendments, modifications or revisions to the Lease, and there are no agreements of any kind between Landlord and Tenant regarding the Leased Premises, except as provided in the Lease or except as follows: (If none, write "None").

    The Lease, and all amendments and other agreements referred to above are referred to in the following portions of this letter collectively as the "Lease".

2.     The Lease has been duly authorized and executed by Tenant and is in full force and effect and Tenant has delivered to Lender concurrently herewith a true, correct and complete copy of the Lease.

3.     Tenant has accepted and is in sole possession of the Leased Premises and is presently occupying the Leased Premises. The Lease has not been assigned, by operation of law or otherwise, by Tenant, and no sublease, concession agreement or license, covering the Leased Premises, or any portion of the Leased Premises, has been entered into by Tenant.

4.     Tenant began or will begin paying rent on _____. Tenant is obligated to pay fixed or base rent under the Lease in the annual amount of $_____, payable in monthly installments of $_____. No rent under the Lease has been paid more than one month in advance, and no other sums have been deposited with Landlord other than $_____ deposited as security under the Lease. Except as specifically stated in the Lease, Tenant is entitled to no rent concessions or free rent. The Lease provides that Tenant pays _____ percent of operating expenses and property taxes.

5.     All conditions and obligations of Landlord relating to completion of tenant improvements and making the Leased Premises ready for occupancy by Tenant have been satisfied or performed or will be satisfied or performed on or before _____, and all other conditions and obligations under the Lease to be satisfied or performed by Landlord as of the date hereof have been fully satisfied or performed.

6.     There exists no defense to, or right to offset against, enforcement of the Lease by Landlord. Neither Landlord nor Tenant is in default under the Lease and no event has occurred which, with the giving of notice or passage of time, or both, could result in such a default.

7.     Tenant has not received any notice of any present violation of any federal, state, county or municipal laws, regulations, ordinances, orders or directives relating to the use or condition of the Leased Premises or the Property.

8.     Except as specifically stated in the Lease, Tenant has not been granted (a) any option to extend the term of the Lease, (b) any option to expand the Leased Premises or to lease additional space at the Property, (c) any right of first refusal for any space at the Property, (d) any right to terminate the Lease prior to its stated expiration, or (e) any option or right of first refusal to purchase the Leased Premises or the Property or any part thereof.

9.     So long as the Deed of Trust is in effect, Tenant will not, without Lender's prior written consent, (a) agree to any assignment, sublease, adjustment, modification, supplement or amendment to the Lease, (b) pay any rent under the Lease more than one month in advance, or (c) agree to any termination, cancellation or surrender of the Lease. Tenant will allow Lender's agents, employees and representatives to inspect the Leased Premises from time to time upon reasonable advance notice.

10.     Tenant agrees to give to Lender, by certified mail, a copy of any notice of default under the Lease served by Tenant upon Borrower.  Tenant further agrees that if Borrower shall have failed to cure such default within the time provided in the Lease, then Lender shall have an additional thirty (30) days after the expiration of Borrower's cure period within which to cure such default, or, if such default cannot be cured within that time, then such additional time as may be necessary if, within Lender's thirty (30) day cure period, Lender shall have commenced and shall be diligently pursuing the remedies necessary to cure such default (including, but not limited to, commencement of foreclosure proceedings if necessary to effect such cure).  Such period of time shall be extended by any period within which Lender is prevented from commencing or pursuing such foreclosure proceedings by reason of the bankruptcy of Borrower. Until the time allowed as aforesaid for Lender to cure such default has expired without cure, Tenant shall have no right to and shall not terminate the Lease on account of default.

The agreements and certifications set forth herein are made with the knowledge and intent that Lender will rely on them, and Lender and Lender's successors and assigns may rely upon them for that purpose.

Very truly yours,

_____

By:_____
Its:_____

The undersigned guarantor(s) of the Lease hereby certify to Lender and its successors and assigns as of the date hereof that his/their guaranty of the Lease is in full force and effect and has not been amended or modified and that the undersigned guarantor(s) have no claims or defenses under the guaranty or otherwise with respect to his/their performance in full of all terms, covenants and conditions of the guaranty.



69042902
11/20/03                                    D-3